FELIX YOUSSOUPOFF, Appellant, *v.* JOSEPH E. WIDENER, Respondent.

Contract — sale — equity — sale of paintings with right to repurchase under stipulated conditions — action to compel acceptance of tender and reconveyance of paintings on ground contract was unconscionable — claim that defendant obtained paintings for inadequate price destroyed by finding that price was fair and adequate — findings not inconsistent when based on conflicting evidence — plaintiff bound by fully understood contract even though price was inadequate — contract not merely loan upon security — law of country where property was situated and contract was made applies — tender not construed as compliance with terms of contract where evidence and findings show it did not comply with conditions.

1. Plaintiff, a Russian exile, sold and delivered to defendant certain valuable paintings subject only to the right to repurchase them in case the plaintiff "finds himself in the position again to keep and personally enjoy these wonderful works of art." In the event of redemption defendant was to have the right to again purchase the paintings should plaintiff wish to dispose of them within ten years. Within the time limited plaintiff tendered to defendant the amount required for redemption, which he had obtained upon his note and an agreement to deposit and pledge the paintings as security with the holder, who on default, might sell and dispose of them without notice. Defendant declined the tender on the ground that plaintiff was not exercising his right to repurchase in accordance with the express conditions limiting it. At the time plaintiff signed the contract of sale he was of full age, had legal advice and fully understood its terms, conditions, provisions and significance. In an action in equity to compel defendant to accept the tender and transfer the pictures on the ground that the contract, as construed by defendant,

is unconscionable and should not be enforced according to its terms, because obtained by unfair and oppressive means, it being claimed that defendant obtained the paintings at an inadequate price by taking advantage of plaintiff's need for ready money, the basis of such contention is destroyed by findings of fact that the amount paid was a fair, reasonable and adequate price for the pictures.

2. A contention that these findings are inconsistent with other findings that a recognized leader in judging the value of great works of art had offered a larger sum for the paintings, cannot be sustained. Testimony of such an offer may be competent evidence of market value but is not conclusive and the trial justice might properly accept the opinions of other witnesses on this point. Finding of value is the result of conflicting testimony or inferences.

3. But even if the pictures at the time defendant acquired them were worth more than he paid for them, plaintiff is still bound by his contract as made. The parties, with full understanding, came to an agreement as to the terms on which plaintiff would part with the pictures. There was no duress on the part of defendant. If he actually bought the pictures, he is entitled to enforce the bargain according to its terms. The courts will not set aside a bargain so made.

4. An argument that a bargain so made is merely a loan upon the security of the pictures, disguised by the form of the written contract as a sale with an option to repurchase, cannot be upheld. The defendant was never willing to make a loan. The plaintiff understood that the defendant entered into the transaction only with a view to becoming the owner of the pictures. Actual intention coincides with the form and terms of the contract, and according to the law of England, where the contract was made and dated, and where the pictures were situated at the time of their transfer, the contract of sale, subject to a limited right of repurchase, must be enforced according to its terms and actual intent.

5. An argument that under the law of Pennsylvania, where defendant resided, where he kept his collection of paintings and where any option to repurchase must be exercised, the contract between the parties would be conclusively presumed to be a mortgage, regardless of their actual intention and enforced only as a mortgage, does not help the plaintiff. The law of England, not the law of Pennsylvania, governs the transaction. The construction and legal effect of a contract for the transfer of, or the creation of a lien upon, property situated in the jurisdiction where the contract is made is governed by the law of that jurisdiction. The fact that defendant obtained the pictures with the intention of removing them to his home does not change the general rule where there is convincing evidence that both parties intended that the law of England should apply.

6. Nor can it be successfully contended that since the provisions for the repurchase of the paintings in Pennsylvania were the only executory provisions of the contract, it should be construed according to the law of Pennsylvania where performance was to be made. The contract in effect is primarily a bill of sale of the paintings, and was so intended. The right to repurchase was merely an incident to · the transfer.

7. Nor may the terms of the contract be so construed that the tender made by the plaintiff of the amount paid by the defendant with stipulated interest may be regarded as a compliance of all the conditions of the contract. The evidence and findings establish that the plaintiff is not in a position to keep and personally enjoy these works of art. If regained by the plaintiff they are to be pledged with and remain in the possession of another collector. They may be enjoyed by the pledgee until the debt is due, may be sold by him or acquired by him if the debt is not paid at the stipulated date. Under these circumstances it is clear that the offer to repurchase the pictures and the tender of the purchase price did not comply with the conditions of the contract upon which the parties had agreed.

*Youssoupoff* v. *Widener*, 219 App. Div. 712, affirmed.

(Argued June 16, 1927; decided July 20, 1927.)

APPEAL, by permission, from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered February 2, 1927, unanimously affirming a judgment in favor of defendant entered upon a dismissal of the complaint by the court on trial at Special Term.

*Clarence J. Shearn* for appellant. The equities of the case are such as to lead the court to construe the contract according to principles of equity rather than according to strict rules of law. (*Whalen* v. *Stuart*, 194 N. Y. 495; *Stokes* v. *Stokes*, 198 N. Y. 301.) According to the laws of Pennsylvania, pursuant to which this instrument should be construed because, among other reasons, its substantial and main executory provisions were to be there performed, such an instrument is conclusively presumed to have been intended to be in the nature of a mortgage. (*Fish* v. *D., L. & W. R. R. Co.*, 211 N. Y. 374; *National Text*

*Book Co.* v. *Connelly,* 206 N. Y. 188; *Manhattan Life Ins. Co.* v. *Johnson,* 188 N. Y. 108.)  Where personal property· has been transferred in jurisdiction A, but at the time of the transfer it was contemplated that the property should forthwith be removed to jurisdiction B and there kept or used, the law of jurisdiction B must be applied in determining the nature of the transaction and the legal effect of the instrument by which the transfer was made.  (*Beggs* v. *Bartels,* 73 Conn. 132; *Matter of Legg,* 96 Fed. Rep. 326; *Cable Co.* v. *McElhoe,* 58 Ind. App. 637; *Title Guaranty & Surety Co.* v. *Witmire,* 195 Fed. Rep. 41; *Stern* v. *Drew,* 285 Fed. Rep. 925; *Matter of Hood Bay Packing Co.,* 280 Fed. Rep. 866; *Matter of Mutual Motors Co.,* 260 Fed. Rep. 341; *Matter of American Steel Supply Syndicate, Inc.,* 256 Fed. Rep. 876; *Wood Mowing & Reaping Machine Co.* v. *Croll,* 231 Fed. Rep. 679; *Matter of Stoughton Wagon Co.,* 231 Fed. Rep. 676.)  Under the law of Pennsylvania the transaction was a mortgage, and, accordingly, any provisions found in the instrument to fetter or clog the right of redemption are void.  (*Kerr* v. *Gilmore,* 6 Watts, 405; *Harper's Appeal,* 64 Penn. St. 315; *Alleghany* v. *Casey,* 79 Penn. St. 84; *Haines* v. *Thomson,* 70 Penn. St. 434; *Huston* v. *Regn,* 184 Penn. St. 419.)  Under the law of England as well as that of the United States, under the circumstances disclosed by the facts found by the Special Term that are binding upon this court, a court of equity will avoid construing a contract so as to work a forfeiture.   (*Lawley* v. *Hooper,* 3 Atk. 278; *Fry* v. *Lane,* L. J. 58 Ch. 113; *Russell* v. *Southard,* 53 U. S. 138; *Wheeler* v. *Smith,* 9 How. [U. S.] 55; *International Harvester Co.* v. *Voboril,* 187 Fed. Rep. 973; *Gould* v. *Okeden,* 4 Brown's Parl. Cas. 198; *Bulwer* v. *Astley,* 1 Phillips Ch. 422; *Waters* v. *Mynn,* 14 Jur. 341; *Douglas* v. *Culverwell,* 4 De G., F. & J. 20.)  According to the law of England, under the circumstances disclosed by the facts found by the Special Term that are binding upon this court, in
12

order to avoid a forfeiture the proper construction to be placed upon the instrument is that it was in the nature of a mortgage. (*Lawley* v. *Hooper*, 3 Atk. 278; *Bulwer* v. *Astley*, 1 Phillips Ch. 422; *Waters* v. *Mynn*, 14 Jur. 341; *Douglas* v. *Culverwell*, 4 De G., F. & J. 20; *Fee* v. *Cobine*, 11 Ir. Eq. 406; *Manlove* v. *Bruton*, 2 Vern. 84; *England* v. *Codrington*, 1 Eden, 169; *Horn* v. *Keteltas*, 46 N. Y. 605; *Dickinson* v. *Oliver*, 195 N. Y. 238; *Farmer* v. *Farmer & Son Type Founding Co.*, 83 App. Div. 218; *Simon* v. *Schmidt*, 41 Hun, 318; *Draper* v. *Draper*, 71 Hun, 349; *Brown* v. *Bement*, 8 Johns. 96; *Russell* v. *Southard*, 53 U. S. 138.) The representation in the contract of August 12, 1921, that appellant would not exercise the right to repurchase unless financially able to " keep and personally enjoy " the paintings did not amount to a condition precedent either compelling or justifying a court of equity in forfeiting such right. (*Williams* v. *Barkley*, 165 N. Y. 48; *Unterberg* v. *Elder*, 211 N. Y. 499; *Barker* v. *Pullman Co.*, 134 Fed. Rep. 70; *Young* v. *Smith*, L. R. 1 Eq. 180; *Ex parte Dawes*, L. R. 17 Q. B. D. 275; *Bailey* v. *Lloyd*, 5 Russ. Ch. 330; *Dawes* v. *Treadwell*, 18 Ch. Div. 354; *Hammond* v. *Hammond*, 19 Beav. 29; *Walsh* v. *Trevanion*, 9 L. J. Q. B. 458; *Elwood* v. *Goldman*, 217 N. Y. 585; *Moran* v. *States Oil Co.*, 211 N. Y. 187; *Broadway Realty Co.* v. *Lawyers Title Co.*, 226 N. Y. 335; *Industrial Trust, Ltd.*, v. *Todd*, 180 N. Y. 215; *Gillett* v. *Bank of America*, 160 N. Y. 549.)

*Nathan L. Miller* and *H. Bartow Farr* for respondent. The law of England and not the law of Pennsylvania governs the transaction of August 12, 1921. (*First Nat. Bank of Toledo* v. *Shaw*, 61 N. Y. 283; *Wilson* v. *Lewiston Mill Co.*, 150 N. Y. 314; *Stumpf* v. *Hallahan*, 101 App. Div. 383; 185 N. Y. 550; *Ohl* v. *Standard Steel Sections Co.*, 179 App. Div. 637; *International Text Book Co.* v. *Connelly*, 206 N. Y. 188; *Fish* v. *D., L. & W. R. R. Co.*, 211 N. Y. 374; *Grand* v. *Livingston*, 4 App. Div. 589;

158 N. Y. 688; *Hooley* v. *Talcott,* 129 App. Div. 233; *Wayne County Savings Bank* v. *Low,* 81 N. Y. 566; *Staples* v. *Nott,* 128 N. Y. 403; *Union Nat. Bank* v. *Chapman,* 169 N. Y. 538.) According to the law of England under the circumstances disclosed by the findings, the transaction is a sale and not a mortgage and the conditions are valid. (*White* v. *Hoyt,* 73 N. Y. 505; *Trustees of East Hampton* v. *Vail,* 151 N. Y. 463; *Marden* v. *Dorthy,* 160 N. Y. 39; *Joy* v. *Birch,* 4 Cl. & F. 57; *Saxton* v. *Hitchcock,* 47 Barb. 220; *Whitney* v. *Townsend,* 2 Lans. 249; *Alderson* v. *White,* 2 DeGex & Jones, 97; *Gossip* v. *Wright,* 32 L. J. Ch. 648; *Williams* v. *Owen,* 5 Mylne & Craig, 303; *Shaw* v. *Jeffery,* 13 Moore's P. C. 432; *Goodman* v. *Grierson,* 2 Ball & Beatty [Ir. Ch.], 274.) The provision in the agreement that the privilege of repurchase will be exercised only in case the plaintiff is in the position again to keep and personally enjoy the pictures is a condition upon his exercise of the privilege. (*Hollis Stores, Ltd.,* v. *Timmis,* 2 Ch. 202; *Weston* v. *Collins,* 34 L. J. Ch. 353; *Keer* v. *Purdy,* 51 N. Y. 629; *Friederang* v. *Aldo Company, Inc.,* 199 App. Div. 127; *Adams* v. *Gillig,* 199 N. Y. 314; *Dawe* v. *Morris,* 149 Mass. 188.)

LEHMAN, J. The plaintiff on August 12, 1921, signed a contract in the city of London which reads as follows:

" Prince Youssoupoff has this day sold and delivered to Mr. Widener his two well-known Rembrandt portraits of a man and a woman which are illustrated and described in the Bode catalogue, for the price or sum of One hundred thousand pounds (£100,000), and has received the full purchase money. Title to the said pictures has passed to Mr. Widener and he accepts delivery of the same.

" Mr. Widener recognizes that Prince Youssoupoff would not have parted with these wonderful pictures for any consideration had it not been for the unhappy plight which has fallen upon him and his countrymen due to the

[246 N. Y. 174]     Opinion per LEHMAN, J.     [July,

dreadful revolution in Russia, and recognizing the very proper and deep-seated wish of Prince Youssoupoff to repossess himself of these pictures in case the present terrible conditions in Russia should readjust themselves within a reasonable time, Mr. Widener grants to Prince Youssoupoff the right and privilege to be exercised on or before January 1, 1924 and not thereafter, of repurchasing these pictures at the purchase price, one hundred thousand pounds (£100,000) plus eight per cent. (8%) interest from this date to the date of repurchase; the repurchase to be made in the City of Philadelphia and the pictures to be redelivered to Prince Youssoupoff upon payment of the full purchase money.

" This privilege is a purely personal one granted to Prince Youssoupoff in recognition of his love and appreciation of these wonderful pictures. It is not assignable nor will it inure to the benefit of his heirs, assigns or representatives and Prince Youssoupoff represents that this privilege of repurchase will be exercised only in case he finds himself in the position again to keep and personally enjoy these wonderful works of art. It is therefore agreed that if the repurchase should be made by Prince Youssoupoff, it will be made only under and subject to conditions to be at that time properly stipulated, that the title to the said pictures then acquired by Prince Yousoupoff will be subject to the right in Mr. Widener or his representatives to take back the pictures upon the payment to Prince Youssoupoff or his representatives of the gross sum which Prince Youssoupoff has paid to Mr. Widener in case Prince Youssoupoff or his representatives should at any time within ten (10) years after the date of the said repurchase wish to dispose of the same, which right may be enforced by Mr. Widener against any party into whose possession the pictures may have come in any manner in contravention to the reserved right of Mr. Widener.

" Mr. Widener will of course take every precaution

to preserve and protect these wonderful works of art, but if for any reason they should be damaged or destroyed or Mr. Widener not be in a position to carry out the resale of the same on or before January 1, 1924, no personal liability shall attach to him in the premises.

" *In Witness Whereof* this paper having been previously executed by Mr. Widener and left with his representative in London, has also been executed by Prince Youssoupoff and delivery made between the parties at London this 12 day of August, 1921.

" (Sgd)   PRINCE F. YOUSSOUPOFF."

" Signed in the presence of:

  " (Sgd)   O. T. RAYNER

      " 9 Kings Bench Walk

        " Inner Temple

          '' London E. C. 4."

The plaintiff received and accepted a counterpart of the agreement which had been executed by the defendant in Pennsylvania and sent by him to his agent in London. The pictures described in the contract were at that time delivered to the defendant's representative in London and removed to defendant's residence in Pennsylvania. The plaintiff received the agreed price or consideration of £100,000.

In December, 1923, the plaintiff tendered to the defendant in the city of Philadelphia, Pennsylvania, the sum of $520,334, which was then equivalent in money of the United States to £100,000 plus interest at the rate of 8% per annum from August 1st, 1921, until the date of the tender, and the plaintiff demanded that defendant deliver to him the paintings referred to in the complaint. At the same time the plaintiff tendered a written stipulation that the title to the pictures " will be subject to the right in Mr. Widener or his representatives to take back the pictures upon the payment to Prince Youssoupoff or his representatives of the gross sum which

Prince Youssoupoff has paid to Mr. Widener in case Prince Youssoupoff or his representatives should at any time within ten years after the date of said repurchase wish to dispose of the same, which right may be enforced by Mr. Widener against any party into whose possession the pictures may have come in any manner in contravention to the reserved right of Mr. Widener."

The money tendered to the defendant was obtained by the plaintiff from C. S. Gulbenkian upon his note for the sum of $551,275 payable one year after date, with interest at six per cent per annum. As security for the payment of the note, the plaintiff agreed that the Rembrandt paintings should be deposited and pledged with the holder of the note. It was stipulated that upon any default in the payment of the note the holder might without notice of any kind to the plaintiff sell and dispose of the pictures so pledged. The holder was expressly authorized " to become the purchaser and absolute owner of said oil paintings or either of them free from any claims, trusts and rights or equities of redemption."

The defendant declined the tender and refused to transfer the pictures to the plaintiff. In effect the defendant's reply to the plaintiff's demand is that the defendant is the absolute owner of the pictures under the contract of sale, subject only to the right of the plaintiff to repurchase the pictures in accordance with the terms contained in the contract. That right is, by its terms, to be exercised only in case the plaintiff " finds himself in the position again to keep and personally enjoy these wonderful works of art." It may not be exercised for the purpose of enabling the plaintiff to transfer the pictures to another. The plaintiff is not exercising his right to repurchase in accordance with the express conditions limiting that right, or, at least, so the defendant claims.

The plaintiff has brought this action in equity to compel the defendant to accept the money tendered to

him, and to transfer the pictures. He disputes the defendant's contentions as to the construction and legal effect of the written contract, and he urges that, if so construed, it would be unconscionable and should not be enforced according to its terms, because obtained by unfair and oppressive means. At the trial there was, on some points, a conflict of testimony, but all the findings are supported by sufficient, and indeed, in most instances, compelling evidence. Judgment in favor of the defendant followed as logical conclusion from these findings.

In reviewing this judgment, we consider, of course, only the findings made at Special Term and affirmed by the Appellate Division. We will summarize those which may have direct bearing upon the questions presented upon this appeal.

The conversations or correspondence, which resulted in the contract of August 12th, 1921, began in the previous June. Prior to that time the plaintiff and the defendant had never met. The plaintiff, Prince Youssoupoff, had resided in Russia prior to the Bolshevist Revolution. He came of a noble family which until the Revolution had enjoyed wealth, which was almost without limit, and great power. In the spring of 1919 he was compelled to flee from Russia. He was able to bring along the two paintings by Rembrandt, which according to the findings are " unique and irreplaceable works of art * * * not excelled in quality by any portraits ever painted by Rembrandt." He also brought along two smaller and less important paintings by the same master, and some family jewels. All the rest of the vast possessions of the family were confiscated. Only the property he brought from Russia was available to meet his various needs. Out of his resources he was supporting his wife and daughter as well as his mother and father, and he was contributing to the support of many Russian refugees. He was, indeed, devoting his entire time and energy to the work of relieving the

distress of these refugees. In the summer of 1921 the family jewels were in pawn, and the two great paintings by Rembrandt were pledged in London for the sum of £44,000. Prince Youssoupoff regarded these paintings as an available means of obtaining more money to meet his needs, which were then pressing.

The defendant Widener was at that time traveling abroad. He was a resident of Pennsylvania, a wealthy and experienced business man and the owner of a great collection of paintings and other works of art. Numerous paintings by Rembrandt were already in his collection. Financial conditions generally and conditions in the art world in particular were greatly depressed. Mr. Widener, in spite of the depression in financial conditions, could raise the money for the purchase of these great paintings by Rembrandt for his collection. The paintings were heirlooms in Prince Youssoupoff's family. He was greatly attached to them. He was desirous of retaining them for his own use, but his needs were great. So the correspondence between Prince Youssoupoff and Mr. Widener began, and it was Prince Youssoupoff or his friends who sought out Mr. Widener.

In July, 1921, while these pictures were still pledged in London for the loan of £44,000, Mr. Widener, accompanied by Prince Youssoupoff and his agent, a man of business experience, visited the storehouse, where the pictures were deposited, and inspected them. At that time Prince Youssoupoff, as the result of previous correspondence, knew that Widener was interested in the pictures only as a possible purchaser. Driving back to his hotel in a taxicab with Prince Youssoupoff and his business agent, Mr. Widener offered to pay £100,000 for the pictures referred to in the complaint and Prince Youssoupoff emphatically refused that offer. He then stated that the lowest price for which he would sell the paintings referred to in the complaint would be £200,000. He had indeed refused an offer of £150,000 for them

1927.]            Opinion, per LEHMAN, J.        [246 N. Y. 174]

made by an agent of Sir Joseph Duveen only five months before, while the market for such works of art was no less depressed.    Mr. Widener stated to Prince Youssoupoff that if he entered into a transaction with plaintiff it would only be on account of his sympathy with him and his admiration for Prince Youssoupoff's work in aiding Russian refugees.

Discussions were continued on the same day at the hotel between Prince Youssoupoff's agent and Mr. Widener.    As a result of these discussions Mr. Widener sent to Prince Youssoupoff a document which the latter signed whereby Prince Youssoupoff purported to " agree upon receipt of one hundred thousand pounds from Mr. Joseph Widener within one month from to-day to sell to him my two well-known Rembrandt portraits.— Reserving the option of purchasing them both from him on or any time before January first, 1924, for the same sum plus eight per cent. interest from date of purchase." Mr. Widener had not at that time agreed to accept the pictures upon those terms.    At most, the evidence and findings show that he had indicated an intention to do so if upon his return to his home, which was then imminent, he found it convenient to raise the sum of £100,000, and that it was understood that he would notify Prince Youssoupoff soon after his return here whether he had been able to do so.    Mr. Widener did return home, and on July 25th, 1921, he sent Prince Youssoupoff a letter inclosing the contract which Prince Youssoupoff signed on August 12th.    There was no pretense in the letter that the proposed contract embodied terms previously agreed upon or constituted an acceptance of the option given by Prince Youssoupoff.    The letter stated that " if the inclosed copy of Agreement of Sale is acceptable to you, I will ask you to cable Widener, Philadelphia, Contract Acceptable Youssoupoff, when I will arrange for my personal and confidential representative, Mr. Arthur Sully, 159 New Bond Street, to pay the money

and take delivery." After receipt of the letter and inclosed contract, Prince Youssoupoff sent Mr. Widener a cable reading in substance: Contract satisfactory Youssoupoff. Three days thereafter the transaction was consummated, the contract was signed, Prince Youssoupoff delivered the pictures and received the agreed consideration.

At the time Prince Youssoupoff signed the contract, he fully understood its terms, conditions and provisions and their significance. He had indeed received legal advice as to the contract from counsel of his own choosing. He did not like to accept its terms; indeed he protested against it to Mr. Widener's representative in London before signing the contract. Nevertheless he did sign it, because his need of £100,000 was pressing. In this action he seeks relief from its terms, now that he can secure greater advantages by contract with other parties.

The plaintiff's claim for relief rests in large part upon the contention that the defendant Widener has obtained the plaintiff's property at an inadequate price, by unconscionably taking advantage of the plaintiff's need of ready money. The basis of such contention is destroyed by the findings of fact that £100,000 was a "fair, reasonable and adequate price for the pictures at any time," and " in July and August 1921 was not less than the fair market value of the pictures." It is said, however, that these findings are inconsistent with the findings that Sir Joseph Duveen had offered the sum of £150,000 for the same paintings in February, 1921, when the market for such works of art was no less depressed than in July and August. This court has at times pointed out the doubtful value of an offer for an article as evidence of its market value. (*Hine* v. *Manhattan Railway Company*, 132 N. Y. 477.) Here the findings do, it is true, negative many of the objections which ordinarily might be raised to such evidence. According to these findings " Sir Joseph Duveen is the recognized leader in his

profession or business  *  *  *  and he is a thoroughly competent judge of the value of great works of art." His offer was "based on his judgment of the value of the paintings to a dealer such as himself." He had seen the pictures and "was anxious to acquire them at the price offered." He was "endeavoring to purchase them for his own account at the lowest possible price, with the expectation of being able to resell them at a profit in the regular course of business." An offer made under such circumstances by a dealer of such reputation may perhaps be competent evidence of market value. Indeed, it would undoubtedly be regarded as very persuasive evidence by most laymen. Nevertheless, even if it be accepted as persuasive evidence, it is certainly not conclusive. It rests only upon opinion, and the opinion of the most expert may be at times mistaken. Though offered as a witness by the plaintiff, Sir Joseph Duveen was not, on the witness stand, questioned about his opinion of the value of the pictures at the time Mr. Widener negotiated for them, and the trial justice might properly accept, as he did, the opinions of other witnesses on this point. The findings are, therefore, in no wise inconsistent. Finding of value is the result of the balancing of conflicting testimony or inferences.

Even if, however, the pictures at the time the defendant acquired them by payment of £100,000 had been worth £150,000, the plaintiff would still be bound by his bargain as made. Prince Youssoupoff was thirty-eight years of age, and understood the meaning of the contract he signed. He had the benefit of the advice of an experienced business man and of his own lawyer. His needs compelled him to raise money. The pictures were available means for obtaining it. Prince Youssoupoff was attached to them. He desired to use them only as security for a loan. He hoped that he could, in such event, redeem them upon a change in his fortunes. Mr. Widener was never willing to loan money on the security of the

pictures. He desired only to add them to his collection. For that purpose he offered £100,000. Prince Youssoupoff might perhaps have refused to sell at any price if he could have raised the money he urgently needed without a sale. He did refuse to sell for that price unless the sale was coupled with a reservation which would give him some opportunity to obtain them again for his own use. Mr. Widener offered a contract with a very limited right in Prince Youssoupoff to repurchase the pictures. Prince Youssoupoff accepted that contract, though unwillingly. Regardless of whether the pictures were worth more or less than the price paid, the parties, with full understanding, came to an agreement upon the terms on which Prince Youssoupoff would part with the pictures. There was no duress on the part of Mr. Widener. He had done nothing to add to the plaintiff's condition of distress. He was not willing nor under any obligation to relieve the plaintiff's distress, except upon his own terms. If the pictures were worth no more than the sum paid to the plaintiff, as the court has found, then Mr. Widener's terms were generous; if the pictures were worth more than that price, the defendant may, on account of plaintiff's exceptional position, have obtained an exceptional bargain. If, however, the defendant actually bought the pictures, he is entitled to enforce that bargain according to its terms. The courts will not set aside a bargain so made. (*Miles* v. *Dover Furnace Iron Co.*, 125 N. Y. 294; Story on Equity Jurisprudence [3d Eng. ed.], section 244; 2 Pomeroy on Equity Jurisprudence [4th ed.], sections 926, 948.)

It is said, however, that a bargain so made is merely a loan upon the security of the pictures, disguised by the form of the written contract as a sale with an option to repurchase. If in fact the parties to the transaction intended a loan or advance, a court of equity will disregard the form in which the transaction is clothed and permit the borrower to redeem the security though he

cannot comply with the strict terms of the contract upon which he might "repurchase" it. (*Lawley* v. *Hooper,* [1745] 3 Atkyns, 278; *Gossip* v. *Wright,* 32 L. J. Chancery, 648; affd., 21 L. T. 271 [reviewing earlier cases]; *Russell* v. *Southard,* 53 U. S. 139; *Horn* v. *Keteltas,* 46 N. Y. 605.) Undoubtedly where a transfer is made of property upon an expressed consideration which is grossly inadequate and below the market value of the property transferred and the transfer is made subject to a right of defeasance, though called a right to " repurchase," by repayment of the amount received with interest, inference may ordinarily be drawn that the parties intended only a loan. (Williston on Contracts, sections 771–773.) The real transaction is, in such cases, the advance of moneys. The property is transferred with intention and expectation that it will be held only until redeemed at a fixed date. If by failure to redeem on the date fixed, or in strict accordance with the terms of the contract, the original owner loses his right to redeem, the result is a forfeiture and the transferee has obtained more than it was the intention of the parties he should receive or than he has paid for. If it was intended only that he should look to the property as security for repayment, then the courts of equity will not enforce the terms of a contract by which, through the misfortune of another, he becomes the owner of the property. (3 Pomeroy's Equity Jurisprudence, section 1194.)

That is not the case here. As we have pointed out, the defendant was never willing to make a loan. The plaintiff understood that the defendant entered into the transaction only with a view to becoming the owner of the pictures. The defendant indeed refused to make a loan, and by the contract which was made the plaintiff was under no personal obligation to repay to the defendant the amount received upon the transfer of the pictures. The parties never intended that the pictures should be transferred in order to secure the defendant for money advanced if the plaintiff should not repay it. The purpose

# 190

of the agreement was to transfer to the defendant the full ownership and enjoyment of the pictures unless the plaintiff repurchased them within the stipulated time and *upon the stipulated terms.* The right in the plaintiff to repurchase was not a right of complete defeasance of the transaction. If the plaintiff repaid to the defendant the amount he had received, the defendant would still retain some rights to the pictures, in case the plaintiff decided to resell them thereafter. These considerations collectively distinguish this case from those where the courts have construed the contract, in accordance with the intention of the parties, as a loan and mortgage. Here actual intention coincides with the form and terms of the contract, and according to the law of England, where the contract was made and dated, and where the pictures were situated at the time of their transfer, the contract of sale, subject to a limited right of repurchase, must be enforced according to its terms and actual intent. (*Alderson* v. *White,* 2 De Gex & Jones, 97; *Gossip* v. *Wright,* 32 L. J. Ch. 648.) Similar result has been reached under the law of many, if not all, of the jurisdictions of the United States.

It is said, however, that under the law of Pennsylvania, where Mr. Widener resided, where he kept his collection of paintings and where any option to repurchase must be exercised, the contract between the parties hereto would be conclusively presumed to be a mortgage, regardless of the actual intention of the parties, and enforced only as a mortgage. The courts below have made no finding to that effect. We have not analyzed the testimony or the Pennsylvania decisions introduced in evidence to determine whether they would support such a finding. We hold that the law of England and not the law of Pennsylvania governs this transaction.

The general rule is well established that the construction and legal effect of a contract for the transfer of, or the creation of a lien upon, property situated in the

jurisdiction where the contract is made is governed by the law of that jurisdiction. (*Goetschius* v. *Brightman*, 245 N. Y. 186.) Various grounds, however, are urged upon which it is said that this case presents an exception to the general rule. We dispose of them briefly.

The instrument is executed by both parties and is the contract of both parties. Therefore, the rule occasionally applied that the construction and legal effect of instruments, which are the act and deed of one person only, such as powers of attorney, etc., may be governed by the law of the maker's domicile (*Knights Templars & Masonic Mut. Aid Association* v. *Greene*, 79 Fed. Rep. 461) has no application here.

The fact that Mr. Widener obtained the pictures with the intention of removing them to his home, does not change the general rule. It is true that it has been held in some States that where property, transferred by contract in one jurisdiction, must be removed to another jurisdiction in order to carry out the purpose of the contract, the construction and effect of the contract may be governed, in accordance with the intention of the parties, not by the law of the jurisdiction where the contract was made and where the property was then situated, but by the law of the jurisdiction to which the property was removed thereafter and where the parties intended that it should be permanently located. (*Beggs & Co.* v. *Bartels*, 73 Conn. 132.) We need not now consider whether upon a similar state of facts we should reach a similar conclusion. If under such circumstances exception to the general rule may be created, that may be done only for the purpose of carrying out a presumed intention of the parties. Here the parties have given convincing evidence that the parties intended that the law of England should apply. We may not by a fictitious inference of other intention change an instrument which the parties intended should be a contract of sale into a mortgage which they never intended.

Finally, it is said that since the provisions for the repurchase of the paintings in Pennsylvania were the only executory provisions of the contract, we should construe the contract according to the law of Pennsylvania where performance was to be made. (*International Text Book Co.* v. *Connelly,* 206 N. Y. 188.) The contract in effect is primarily a bill of sale of the paintings, and was so intended. The right to repurchase was merely an incident to the transfer. The transfer of title was completed simultaneously with the signing of the contract. The parties certainly did not intend the law of Pennsylvania should apply to the transfer of property completed in England by contract made and dated there and by delivery accepted there. Under the law of England, full ownership was then transferred to the defendant, subject only to a condition that plaintiff should have a limited right to repurchase in Pennsylvania. Since full ownership had then been transferred to the defendant, and the plaintiff no longer held an equity of redemption, he might regain the pictures only by exercising his option of repurchase in accordance with the provisions of the contract. If we assume that the parties intended that the law of Pennsylvania should apply to the provisions giving an option of repurchase, and construe those provisions accordingly (*Hamlyn & Co.* v. *Talisker Distillery,* [1894] Appeal Cases, 202), we must begin construction upon the basis, fatal to plaintiff's claim, that these provisions apply to property of which the defendant is the full owner and in which the plaintiff has no equity of redemption.

Defeated in his contentions that the contract should not be enforced in accordance with its express terms, the plaintiff still contends that the terms of the contract should be so construed that the tender made by the plaintiff of the amount paid by the defendant with stipulated interest might be regarded as a compliance of all the conditions of the contract. The plaintiff

" represents " in the contract that " the privilege of repurchase will be exercised only in case he finds himself in the position again to keep and personally enjoy these works of art." The evidence and findings establish that the plaintiff is not in a position to keep and personally enjoy these works of art. The works of art if regained by the plaintiff are to be pledged with and remain in the possession of another collector. They may be enjoyed by the pledgee until the debt is due, may be sold by him or acquired by him if the debt is not paid at the stipulated date. The plaintiff contends that these circumstances are irrelevant on the ground that his " representation " of future intention is not equivalent to a condition or covenant, and that all the other conditions of the contract have been met according to the letter of the contract. The intent of the parties is plainly expressed. It may not be defeated by a forced or technical construction of isolated words. Beyond question the parties understood that the plaintiff's right to repurchase the pictures might be exercised only if by a turn of the wheel of fortune he became able to keep and personally enjoy them. If he did repurchase them he might not within ten years " dispose " of them. The plaintiff has not the means to repurchase the pictures for his own enjoyment, or to repay to C. S. Gulbenkian the amount he has tendered to the defendant. He has in writing offered the pictures for sale while still in the defendant's possession. If the plaintiff is able to obtain them from the defendant, the terms of the pledge to Mr. Gulbenkian would make it possible for Mr. Gulbenkian to sell them to others or to obtain title to them himself. Under these circumstances it is clear that the offer to repurchase the pictures and the tender of the purchase price did not comply with the conditions of the contract upon which the parties had agreed.

The judgment should, therefore, be affirmed, with costs.

CARDOZO, Ch. J., POUND, CRANE, ANDREWS, KELLOGG and O'BRIEN, JJ., concur.

Judgment affirmed, etc.