360 F.2d 704
 John SUSI, Appellee-Cross-Appellant,
v.
BELLE ACTON STABLES, INC., and Harold Rosenberg, Appellants, and
Jack Stahl and Rona Plastics Corp., Now known as Stahl Liquidating Corp., Cross-Appellees.
 No. 188.
 Docket 29620.
 United States Court of Appeals Second Circuit.
 Argued December 10, 1965.
 Decided April 20, 1966.
 
 COPYRIGHT MATERIAL OMITTED Julius M. Gerzof, Freeport, N. Y. (Allinson & Gerzof, Freeport, N. Y.), for defendants-appellants, Belle Acton Stables, Inc. and Harold Rosenberg.
 David J. Weinblatt, Freeport, N. Y., for cross-appellees, Jack Stahl and Rona Plastics Corp., now known as Stahl Liquidating Corp.
 William E. Kelly, New York City (Casey, Lane & Mittendorf, New York City) (Alan R. Wentzel, New York City, of counsel), for appellee-cross-appellant, John Susi.
 Before LUMBARD, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 We have here an appeal and a cross-appeal from a judgment of the District Court for the Southern District of New York in a diversity action for the conversion of racehorses. The judgment, rendered by Judge Graven of the Northern District of Iowa, was based upon a memorandum which carefully set forth his findings of fact and conclusions of law; our gratitude for this, which has facilitated our consideration of the appeals, is not lessened by our disagreement with some of the results.
 
 
 2
 When the curtain rises in 1959, we find Landers Stables, Inc., a Maine corporation with its place of business in the town of Kittery, owning three horses, Belle Acton, Storm Moraka and Wonderful One, and a half interest, along with one William O'Connell, in a fourth, Esquire Direct. All of the corporation's stock was owned by George Landers and his wife, Irene, both residing in Kittery. The horses raced in meets approved by the United States Trotting Association in New York and various other states, not including Maine; they moved from state to state as occasion demanded but spent most of their time in New York, at a stable operated by William Haughton. They were soon to become the subject of a considerable series of security interests, of little immediate concern to them but now of much to us.
 
 
 3
 First in time was a chattel mortgage on Belle Acton for $15,000, later reduced to $8,000, as security for a loan from one Jerry Tuccio. This was executed on July 20, 1959, when the mare was sojourning in Meadowdale, Pennsylvania, and was there recorded; along with the mortgage Landers delivered to Tuccio the horse's certificate of registration with the United States Trotting Association, endorsed in blank.
 
 
 4
 Next came the chattel mortgage whence this action springs. Executed in Maine and given to plaintiff John Susi, also a resident of Kittery, it was dated October 5, 1959, covered the three and a half horses, and was to secure payment of a $12,500 ninety-day promissory note payable at a bank in Maine. It was recorded in Maine on the day of execution and only there, although the horses were then in New York and Pennsylvania. Susi did not know of the mortgage of Belle Acton to Tuccio, which was not yet recorded in Maine. On January 8, 1960, Landers paid Susi $7,000 and the $5,500 balance was extended for sixty days.
 
 
 5
 In an endeavor to procure funds to take care of this and other obligations, Landers sought the aid of defendant Jack Stahl, a New York racing enthusiast who was owner, along with a brother, of Rona Plastics Corporation, a New York corporation now known as Stahl Liquidating Corporation. Stahl put Landers in touch with Joseph Vogel, also a New York resident, to whom Landers, on March 24, 1960, executed a $15,000 mortgage on Belle Acton, Storm Moraka, and Wonderful One, as well as some other horses not here involved. This mortgage was recorded in New York, Pennsylvania and Maine; Vogel had knowledge of Susi's mortgage. Vogel disbursed $9,500 which Landers apparently used to pay federal taxes, but not the balance of $5,500 which had been intended to enable him to discharge his debt to Susi. Landers did not pay the outstanding $5,500 and, on April 16, 1960, Susi served notice on Landers of his intention to foreclose the chattel mortgage. Under the Maine statute permitting strict foreclosure without sale, Rev. Stat. ch. 178, §§ 4-6 (1954), the right of redemption was automatically forfeited if the debt was not paid within sixty days after notice; the redemption period expired on June 16, 1960 without payment.
 
 
 6
 While all this was going on, Landers was piling up indebtedness to Haughton for the care of the horses — an indebtedness for which, as all admit, Haughton had a stableman's lien under § 183 of the New York Lien Law, McKinney's Consol. Laws, c. 33. In May 1960 Tuccio came to Haughton's stable in Nassau County and demanded possession of Belle Acton under his $8,000 chattel mortgage. Haughton paid Tuccio $8,000 and received the horse's certificate of registration. By August 1960 Haughton's lien claim against the horses here involved, including the $8,000 paid to Tuccio, amounted to $32,000.
 
 
 7
 At this point the defendant Rosenberg, a son-in-law of Stahl, entered the stage. On August 2, 1960, having purchased both O'Connell's and Landers' interests in Esquire Direct the previous month, he entered into an agreement with Haughton and Landers Stables. This recited that Haughton had a lien in excess of $21,000 on the four horses involved in this action and two others; that he had endorsed in blank the certificates of registration of Belle Acton, Storm Moraka, Wonderful One and another horse; and that Rosenberg was desirous of acquiring the certificates of registration and paying the liens, on the terms therein set forth. Rosenberg was to pay Haughton $21,000 in two checks; upon their collection he was to receive the certificates of registration and could demand an assignment of Haughton's lien; Haughton was to retain possession of the horses and agreed not to release this save to Rosenberg or his designee; Landers consented to all the terms of the agreement and warranted that upon payment of the $21,000, the horses would be free and clear of all liens save for the $5,500 owed to Susi and the $9,500 owed to Vogel. Rosenberg paid the $21,000, obtaining the greater part of the money by an unsecured loan from Rona Plastics. The record suggests that the stimulus to this transaction was that Belle Acton, a former champion, after sundry unsuccessful attempts at breeding, was carrying a foal.
 
 
 8
 Shortly thereafter Belle Acton Stables, Inc., a New York corporation, the directors of which were Rosenberg, his attorney and Landers, was formed. On August 12, 1960, Rosenberg transferred ownership of Belle Acton, Storm Moraka and Wonderful One to the corporation; he kept Esquire Direct in his own name. The horses continued in Haughton's care, being occasionally bred and raced. New certificates of registration were obtained and several of the horses were raced under the name of Belle Acton Stables.
 
 
 9
 In late February 1961 Susi demanded that Rosenberg and Belle Acton Stables recognize his title to the three and a half horses; no such recognition was given. On February 25 Belle Acton Stables, with Stahl as intermediary, sold Belle Acton for $35,000, reserving the right to the foal she was then carrying; it sold Storm Moraka and Wonderful One for $5,000 and $3,000 respectively. In March 1961 Susi sued Rosenberg and Belle Acton Stables for conversion of the three horses, and Rosenberg for conversion of the half interest in Esquire Direct; he subsequently amended the complaint to add Stahl and Rona Plastics as defendants on both claims on the theory that Rosenberg and Belle Acton Stables had been acting as their agents.
 
 
 10
 The district judge found that Rosenberg had converted the half interest in Esquire Direct on July 6 and the other three horses on August 2. He entered judgment against Rosenberg and Belle Acton Stables for the value of the horses on those dates, which he found to be $51,250,[1] without allowance for Haughton's lien which he held was lost when Haughton transferred the right to possession to Rosenberg. In arriving at this conclusion the judge found against the defendants' claim that Susi's debt had been paid, and we accept this finding as not clearly erroneous. The judge dismissed the claim against Stahl and Rona Plastics. Rosenberg and Belle Acton Stables appeal from the judgment against them, Susi from the failure to award judgment against Stahl and Rona Plastics.
 
 I.
 
 11
 The first problem is to determine who had title to what and subject to what at the time of the August 2 transaction. Susi does not dispute that Tuccio's mortgage on Belle Acton, validly recorded in Pennsylvania, and Haughton's stableman's lien, would both have had priority over his mortgage if proper proceedings had been taken to enforce them, but contends this was lost. Postponing that issue we now address ourselves to the effect of the Maine foreclosure.
 
 
 12
 Maine, which adopted the Uniform Commercial Code only in 1963, Me. Rev. Stat. ch. 190, has long adhered to the theory that a chattel mortgage passes title to the mortgagee. Initially there was no right of redemption whatever after the condition was broken. Flanders v. Barstow, 18 Me. 357 (1841). In 1841 the legislature accorded such a right for a period of sixty days but without establishing any procedure for foreclosure. See Clapp v. Glidden, 39 Me. 448 (1855); Winchester v. Ball, 54 Me. 558 (1867). Twenty years later, it provided for serving on the mortgagor and filing at the place of recordation a notice of foreclosure, with the right of redemption extended sixty days thereafter, see Loggie v. Chandler, 95 Me. 220, 49 A. 1059 (1901). Otherwise the rigors of the original doctrine remained. If performance of the condition was not given or tendered within the statutory period, "the property vests absolutely in the mortgagee, leaving no scintilla of right in the mortgagor cognizable either at law or in equity." Loggie v. Chandler, supra, 95 Me. at 227, 49 A. at 1062. See also Consolidated Rendering Co. v. Stewart, 132 Me. 139, 168 A. 100, 88 A.L.R. 908 (1933).
 
 
 13
 We see no basis for the defendants' contention that Maine's strict foreclosure was inapplicable here because Maine would not have recognized the recording of a mortgage, even between its own residents, on chattels not and not expected to be within the state. We see nothing in the language of the statute[2] or in the decisions much argued by the parties[3] to indicate that Maine would have refused to record a chattel mortgage between two residents simply because roving chattels were not and were not intended to be brought within the state. The statute emphasized filing at the place where the mortgagor resides rather than where the property is located and, in making an unrecorded mortgage void against a trustee in bankruptcy or an assignee for the benefit of creditors, it served an obvious purpose, even though it might not be effective against persons dealing with the chattels at their situs. The consequences of failure to record, and the effect of recordation on persons in other states not having notice of the mortgage, are different matters which we need not discuss.[4]
 
 
 14
 We thus reach the question whether New York, which would not have permitted foreclosure of a chattel mortgage on the horses save by a suit in equity,[5] see Briggs v. Oliver, 68 N.Y. 336 (1877), would recognize a Maine strict foreclosure even as between Maine residents on chattels that were in New York or Pennsylvania when the mortgage was executed and in New York when the foreclosure occurred.[6] The Restatement (Second) of Conflict of Laws now in progress gives us a method of approach but little more. Section 254a, Tent. Draft No. 5 at 82 (1959), tells us that "The law of the state where a chattel was at the time of an occurrence determines the effect of the occurrence upon interests in the chattel," but warns, in contrast to the bold blackletter of the First Restatement, that "The law of this state determines whether the case should be decided by its local law or by the local law of some other state." The commentary tells us that when the "contacts" are divided, "the courts of the state of the chattel's situs would apply its local law to determine the effect of the occurrence upon interests in the chattel unless, in their opinion, the application of the law of another state would clearly be more appropriate"; an example of the latter situation, not too far from this case, is where the controversy is between parties to a contract, in which case the courts of the situs "would apply the local law of the state governing the parties' contract if in their opinion this state is the one most closely connected with the parties and with the occurrence as a whole." Id. at 83-84. When we come still closer to the problem here presented, the apparent simplicity of § 281, which states "The power to foreclose a mortgage, pledge or lien on a chattel, or to repossess a chattel under a conditional sale, and the right to redeem are determined by the law of the state where the chattel was at the time the mortgage, pledge, lien or conditional sale was created," disappears when we read in the commentary that "Since issues of the sort dealt with in this Section usually arise between the immediate parties to the incumbrance, the courts of that state [i. e. of the situs] may apply the local law of the state which governs the parties' contract." Id. at 139-40.
 
 
 15
 We are confident that New York would not give effect to the Maine foreclosure as against persons who had purchased or loaned money on the security of the horses without knowledge of the foreclosure, even though they knew of Susi's mortgage and their interests would thus be subject to it as a prior lien. One objective of New York's generally requiring the foreclosure of chattel mortgages by judicial proceeding was that persons who dealt with the mortgagor as an owner, even of encumbered chattels, should not find themselves liable as converters because of events of which they were unaware. But it does not follow that New York would have taken the same view as to the effect of strict foreclosure on an out-of-state mortgagor who had full knowledge thereof. The mortgage here was executed in Maine, between two Maine residents, to secure a short-term indebtedness payable in Maine; it followed the Maine form of being a bill of sale, reserving to Landers only the right of possession until condition broken, and was promptly recorded in Maine. Although the parties did not state in so many words that they intended Maine law to apply, such a combination of circumstances suggests that they did, and we perceive no basis for doubting that as between themselves New York would give effect to their desire. Cf. Youssoupoff v. Widener, 246 N.Y. 174, 190-191, 158 N.E. 64, 69-70 (1927); Wyatt v. Fulrath, 16 N.Y.2d 169, 264 N.Y.S.2d 233, 211 N.E. 2d 637 (1965). See generally Ehrenzweig, Conflict of Laws 623-24 (1962); Cavers, The Conditional Seller's Remedies and the Choice-of-Law Process, 35 N.Y.U.L.Rev. 1126 (1960).
 
 
 16
 The perplexing question is whether New York would treat the defendants as we think it would treat Landers if Susi had sued him. Their admitted knowledge of Susi's mortgage and of its being in default, while sufficient to rule out any claim based on lack of New York recordation, would not be enough to convince us that New York would treat them as we believe it would treat Landers. The evidence, however, goes beyond this. Landers testified that prior to the execution of the August 2, 1960 agreement, he told Stahl and Rosenberg not merely that Susi held an overdue mortgage but that it had been foreclosed. Yet the force of this is weakened by an accompanying remark that Susi's mortgage "had to be paid" — a remark consistent with Landers' warranty that the horses would be free and clear of all encumbrances save the mortgages to Susi and Vogel.
 
 
 17
 We must confess some uncertainty where this leaves us. Would New York say that, absent actual knowledge by the defendants of the effect of a Maine foreclosure, it will apply its local law as to how chattel mortgages are to be enforced? Or would it say that the defendants knew enough to charge them with a duty of inquiry and, failing in that, are to be treated as Landers would have been and must look to him for redress? What indeed would we say if the role assigned federal judges in such cases allowed us to make a choice rather than a considered guess? Indeed, are we not doing pretty much that when the state precedents are such an uncertain trumpet? After "prolonged cerebration," see Cooper v. American Airlines, Inc., 149 F. 2d 355, 359, 162 A.L.R. 318 (2 Cir. 1945), but without profound conviction, we think New York would place the defendants in Landers' shoes. Although Landers' statement that Susi had foreclosed would not necessarily mean the equity of redemption had been extinguished, it could mean that, and the defendants and the attorneys who represented them in the transaction thus could not simply assume that payment of Susi's debt would end the matter.[7]
 
 II.
 
 18
 Agreeing wih the district court that the transfer of the right to possession by the August 2 agreement would have been a conversion if defendants acquired only the rights of Landers, we now turn to a variety of complaints over the court's refusal to give any effect to defendants' acquisition of the rights of Haughton.[8]
 
 
 19
 Susi does not dispute that Haughton had a stableman's lien under Lien Law § 183, and that since the horses were entrusted to Haughton before execution of the chattel mortgage, the stableman's lien, including amounts accruing after the execution of the mortgage and indeed after the Maine foreclosure, was prior to Susi's interest. See Johanns v. Ficke, 224 N.Y. 513, 121 N.E. 358 (1918); compare Barrett Mfg. Co. v. Van Ronk, 212 N.Y. 90, 105 N.E. 811 (1914). Moreover, when Haughton paid off Tuccio's mortgage, which also ranked Susi's, he became subrogated to the rights of the prior lienholder. Restatement, Restitution §§ 104, 162 (1937); Cole v. Malcolm, 66 N.Y. 363, 366 (1876); Gerseta Corp. v. Equitable Trust Co., 241 N.Y. 418, 426, 150 N.E. 501, 504, 43 A.L.R. 1320 (1926). Susi claimed, however, and the district court held, that Haughton's stableman's lien could not be assigned, that it therefore afforded no cloak to defendants' assertion of dominion over the horses and could not even be used to reduce damages. The court made no distinction with reference to the Tuccio mortgage which it evidently considered to be simply a part of Haughton's lien.
 
 
 20
 We disagree that the stableman's lien was not susceptible of assignment. New York recognizes that the closely related artisan's lien, Lien Law § 180, will pass with transfer of the debt and possession of the bailed articles. Nash v. Mosher, 19 Wend. 431 (1838); Goyena v. Berdoulay, 154 N.Y.S. 103 (App.T. 1st Dept. 1915); Lieberman v. Mulhern Steam Heating Co., 159 N.Y.S. 43 (App.T. 1st Dept. 1916); Triple Action Spring Co. v. Goyena, 93 Misc. 171, 156 N.Y.S. 1064 (App. T. 1st Dept. 1916). In the case of Dealer Plan Corp. v. Automotive Wholesalers, Inc., 9 Misc.2d 1052, 164 N.Y.S.2d 516 (1st Dept. 1957), the Appellate Division held similarly with respect to the garageman's lien under § 184, distinguishing on their facts two contrary decisions of lower courts which had ruled such a lien not assignable where transfer would constitute a breach of the lienholder's contract of bailment. Koroleff v. Schildkraut, 179 N.Y.S. 117, 119 (App.T. 1st Dept. 1919); General Motors Acceptance Corp. v. Barnett, 142 Misc. 192, 254 N.Y. S. 166, 175 (Mun.Ct.1931). To be sure, in Fitchett v. Nanary, 59 Super. 383, 27 J. & S. 383, 14 N.Y.S. 479 (1891), aff'd, 131 N.Y. 664, 30 N.E. 868 (1892), a stableman's lien was held unassignable where the bailee transferred the stable and horses to a new keeper, but that decision is distinguishable on the Dealer Plan rationale that such a transfer was inconsistent with the bailment. Susi's attempt to distinguish Dealer Plan because of the presence in § 183 of the words "dependent upon the possession" which are not found in § 184 must be rejected; the quoted words scarcely differ from the "while lawfully in possession thereof" used in § 180 with respect to the artisan's lien, which New York has held to be assignable, and seem designed only to emphasize that the lien is lost by delivery of the goods to the bailor or to any other person not acquiring the debt. See Johanns v. Ficke, supra, 224 N.Y. at 518-521, 121 N.E. 358.
 
 
 21
 While complete reconciliation of the decisions may not be possible, we think that, as to all the historic possessory liens of bailees other than that of an attorney, New York today would follow the rule that the lien will pass upon assignment of the claim and transfer of possession, save when the transfer is of such a character as to constitute a material breach of the bailment. Restatement, Security § 67(1), at 195 (1941), contrast illustrations 1, 2, 3, with illustrations 4, 5, 6, id. at 196-99; see explanatory notes in Tent. Draft No. 3, 168-73 (1939); and Brown, Personal Property § 120, at 595 & n. 20 (2d ed. 1955). Although the case would stand differently if Rosenberg had carted the horses off to California, a plan whereby Haughton was to retain physical possession as the assignee's agent was not such a breach; the horses remained exactly where Landers had placed them and Susi had been content to leave them and were handled as they had previously been. Compare Park v. Hull of the Edgar Baxter, 37 F. 219 (S.D.N.Y.1888). The acceptance of legal possession under the assignment of Haughton's lien on August 2 thus did not, in and of itself, constitute a conversion.
 
 
 22
 On the other hand the defendants must be held liable for any wrongful exercise of dominion that interfered or was inconsistent with Susi's ownership of the horses, see Prosser, Torts § 15, at 87-94; Restatement (Second), Torts §§ 222A-241 (1965), and we must determine whether and, if so, when this occurred. The mere acceptance of an instrument by which Landers improperly asserted that title should vest in Rosenberg subject to the Susi and Vogel mortgages would appear insufficient in the absence of any change in physical possession of the horses. See Matteawan Co. v. Bentley, 13 Barb. 641 (N.Y.1852); Andrews v. Shattuck, 32 Barb. 396 (N.Y. 1860); Hall v. Merchants' State Bank, 199 Iowa 483, 202 N.W. 256, 38 A.L.R. 1093 (1925); N.Y. Jurisprudence, Conversion § 41 (1960).[9] Rosenberg's purported transfer of ownership to Belle Acton Stables, though raising a closer question on which no guidance from the precedents has been found, should, we believe, be considered to be simply a formal transaction and similarly inconsequential as an interference with control of the property. On the other hand, the obtaining of new certificates of registration of the horses in the name of Belle Acton Stables and racing the horses as owner constituted a proclamation of title to the racing world. If there were any doubt that this constituted a conversion, there could be none as to the sale of the horses without compliance with the statutory provisions for enforcing the assigned lien, Lien Law §§ 200-202. See Herschenhart v. Mehlman, 125 Misc. 887, 213 N.Y.S. 48 (App. T. 2d Dept. 1925); Brown, Personal Property § 127. And the failure to recognize Susi's title to the racehorses on proper demand must be held a conversion under the circumstances because it represented an unqualified refusal to deliver the chattels or a claim of ownership waiving the stableman's lien on which lawful possession was based. See Everett v. Saltus, 15 Wend. 474, 478 (1836), aff'd, 20 Wend. 267 (N.Y.1838); Holbrook v. Wight, 24 Wend. 169, 180 (1840); Clark v. Rideout, 39 N.H. 238 (1859); Williams v. Smith, 153 Pa. 462, 25 A. 1122 (1893); Brown, Personal Property § 123.
 
 
 23
 However, this still leaves the question of the amount of Susi's recovery. Although a bailee forfeits a possessory lien by converting the property entrusted to him, he is generally allowed to set off the amount of the lien when sued for conversion by the bailor. See Brown, Personal Property § 127, at 620 & n. 73. While no New York cases on the point have been cited, we see no reason to doubt that the state would follow this general rule. In most instances the controversy arises between the original bailor and the bailee and it is immaterial whether deduction of the lien claim rests on a theory of set-off or on the basis that all the bailee converted was the encumbered property, or on both. See Ingersoll v. Van Bokkelin, 7 Cowen 670, 680 (N.Y.1827); Chamberlin v. Shaw, 18 Pick. 278, 35 Mass. 278, 283-284 (1836) (Shaw, C. J.). In this case, however, where the suit is by a successor to the bailor, the first theory would not support an offset for amounts accrued prior to the expiration of the Maine period of redemption on June 16, 1960 — these being a debt owed by Landers but not by Susi, although he would have had to pay them to get the horses.
 
 
 24
 Opposition to the theory that the bailee converted only an encumbered interest has rested on the basis that the lien, being possessory in character, was dissolved by the very act of conversion. See Mulliner v. Florence, [1878] 3 Q.B. 484. However popular this metaphysical type of reasoning was a century ago, it is not in much vogue today; we fail to see why an owner of horses who could get possession of them only by paying some sixty per cent of their value for their care and feeding, should be able to recover a hundred per cent because the stableman's assignee, mistaking his legal rights, made a wrongful assertion of dominion over the property. Granted that generosity in allowing set-offs lessens the deterrent effect of trover, we think the harsh rule of denial should be applied, if at all, only where the property was unique, in the sense that money damages are insufficient, or the assignee acted in obvious bad faith.[10]
 
 
 25
 We thus hold that as to Belle Acton, Storm Moraka and Wonderful One the measure of recovery, with proper adjustment in all cases for interest, is the value of the horses at the time of conversion, less Haughton's lien upon them as of August 2, 1960, including his rights under the Tuccio mortgage.[11] Somewhat different considerations may apply with respect to the half interest in Esquire Direct. It can be argued that this was converted as soon as Rosenberg acquired the half interest from Landers, since that was prior to his purchase of Haughton's lien; on the other hand, since Susi had no right to possession, it can be claimed there was no conversion then or since. In any event the only damages would be the value of the half interest, found by the judge to be $2750, less an allocable share of the stableman's lien. We leave this minor issue to be developed on a fuller record if the parties should not be able to agree on a solution.
 
 III.
 
 26
 This brings us at long last to the cross-appeal from the dismissal of the complaint against Stahl and his corporation, Rona Plastics. The issue is whether Stahl merely brought the parties together, or whether he and the corporation were the true principals for whom his son-in-law Rosenberg was acting as an agent or front. Landers testified that all the dealings were with Stahl, who had shown an interest in the horses before Rosenberg appeared at all. The funds used by Rosenberg to pay Haughton were an interest free advance from Stahl and Rona Plastics, which Stahl admitted he did not classify as a loan.[12] Bills for stabling the horses after August 2 were sent directly to Stahl and paid by him. Stahl, not Rosenberg, made the sale of Belle Acton. Finally a sufficient motive for having Rosenberg appear as the registered owner of the horses was shown in Stahl's wish to avoid having to apply for a license from the New York Harness Racing Commission. Under these uncontroverted facts, Rosenberg must be considered to have acted as Stahl's agent, rendering Stahl and Rona Plastics also liable for the conversion. See Aeroglide v. Zeh, 301 F.2d 420, 422 (2 Cir.), cert. denied, 371 U.S. 822, 83 S.Ct. 38, 9 L.Ed. 2d 61 (1962); Passaic Falls Throwing Co. v. Villeneuve-Pohl Corp., 169 App.Div. 727, 155 N.Y.S. 669 (1st Dept. 1915).
 
 
 27
 On the appeal the judgment is reversed and the cause remanded for recomputation of damages in accordance with this opinion; on the cross-appeal the judgment is reversed. No costs.
 
 
 
 Notes:
 
 
 [1]
 Of this total $40,000 was for Belle Acton
 
 
 [2]
 "Sec 1. Mortgages of personal property; record. No mortgage of personal property shall be valid against a trustee in bankruptcy or an assignee in insolvency of the mortgagor, or against an assignee under a general assignment for the benefit of the creditors of the mortgagor, or against any person other than the mortgagor, unless and until possession of such property is delivered to the mortgagee within 20 days from the date written in said mortgage, or, when undated, then from the date of execution and delivery of the same, and unless such possession is retained by the mortgagee, or unless and until the mortgage or a memorandum thereof is recorded within the said period of 20 days in the office of the clerk of the city, town or plantation organized for any purpose, in which the mortgagor resides when the mortgage is given, or registry of deeds as hereinafter provided. When all mortgagors reside without the state, the mortgage or a memorandum thereof shall be so recorded in the office of the register of deeds in the registry district where the property is when the mortgage is made; but if a part of the mortgagors reside in the state, then in the cities, towns or plantations so organized in which such mortgagors reside when the mortgage is given. * * *"
 Me.Rev.Stat. ch. 178 (1954).
 
 
 [3]
 Emerson Co. v. Proctor, 97 Me. 360, 54 A. 849 (1903); Boscho, Inc. v. Knowles, 147 Me. 8, 83 A.2d 122 (1951)
 
 
 [4]
 It should be understood that the foregoing discussion relates to the law of Maine as it was before that state's enactment of the Uniform Commercial Code in 1963. See U.C.C. § 9-102
 
 
 [5]
 Under the New York Lien Law, where the mortgagee had possession of the property, he could not enforce his lien by public sale pursuant to § 200, which did not apply to chattel mortgages, but he could sell under an express or implied power of sale in the mortgage. See N.Y. Jurisprudence, Chattel Mortgages §§ 178-86. And where he did not have possession, under § 239 he could retake the goods and sell if the mortgage so provided and was to secure the unpaid purchase price of goods sold for $3,000 or less for any use other than a commercial or business use. New York procedure after default under a chattel mortgage is now governed by the Uniform Commercial Code, § 9-102 et seq
 
 
 [6]
 As in the case of the issue of Maine law, see fn. 4, we consider this without regard to the Uniform Commercial Code, which became effective in New York on September 27, 1964. Section 9-102 makes Article 9 of the Code applicable, with exceptions not here pertinent, to any transaction "which is intended to create a security interest in personal property" so far as concerns any property within New York. Section 9-503 provides for repossession of collateral after default, § 9-504 for disposition by public or private sale, and § 9-505 for retention by the creditor in certain cases. The Official Comment to § 9-102 states that the intention is that, as regards Article 9, "the law of the state where the collateral is located should be the governing law, without regard to possible contacts in other jurisdictions," this contrasting "with the `broad' approach stated in Section 1-105 with reference to the applicability of the Act as a whole." But § 10-101 makes clear that the Code applies only "to transactions entered into and events occurring on and after" the effective date
 
 
 [7]
 We find no force in defendants' claim that their position is improved because Haughton held certificates of registration on the four horses issued by the United States Trotting Association. There was no evidence that such a certificate is a document, to borrow the language of the Uniform Commercial Code, "adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers." Section 1-201(15). Defendants knew Haughton was a lienor and was holding the certificates in that capacity
 
 
 [8]
 Although it does not appear that Haughton ever made the formal assignment of lien called for by the August 2 agreement, we do not deem that material
 
 
 [9]
 We recognize that in the decisions cited, refusal to find conversion in the receipt of a document of title was based in large measure on the defendant's not having possession of the chattels. Compare Laverrierre v. Casco Bank & Trust Co., 155 Me. 97, 151 A.2d 276 (1959) (defendant held liable in conversion for selling chattels even though it never had actual possession). In this case, however, notwithstanding an attempt by Landers to convey a title he did not have, whatever possession Rosenberg had may be regarded as held in his capacity as Haughton's assignee, leaving the element of interference with Susi's dominion over the chattels immediately after August 2, 1960, to rest entirely on the instrument purporting to convey title
 
 
 [10]
 Even under the set-off theory, the defendants would be able to interpose both the amount of Haughton's lien accruing after Susi became the owner of the horses and before August 2, and the $8000 Tuccio mortgage which was assertable by subrogation
 
 
 [11]
 No set-off is allowable for amounts expended on the horses between August 2, 1960 and the conversion; defendants regarded the horses as theirs, took the earnings and are responsible for the expenses. Apparently earnings prior to August 2 went to Haughton who applied them to his bills
 
 
 [12]
 Rosenberg was uncertain whether it was or wasn't until his attorney prompted him